**KLAMATH MEDICAL SERVICE BU-REAU, Petitioner,**

v.

**COMMISSIONER OF INTERNAL REV-ENUE, Respondent.**

**No. 16025.**

United States Court of Appeals
Ninth Circuit.

Dec. 15, 1958.

Rehearing Denied Jan. 26, 1959.

Mautz, Souther, Spaulding, Denecke & Kinsey, James R. Moore, William H. Kinsey, Portland, Or., for petitioner.

Charles K. Rice, Asst. Atty. Gen., Grant Wiprud, Helen A. Buckley, Lee A. Jackson, Attorneys, Department of Justice, Washington, D. C., for respondent.

Before STEPHENS, Chief Judge, and BONE and BARNES, Circuit Judges.

BARNES, Circuit Judge.

This is a petition for review of federal income taxes for the years 1951, 1952 and 1953. Timely petition to this Court was made after decision in the Tax Court. This Court has jurisdiction under Int. Rev.Code of 1954 § 7482, 26 U.S.C. § 7482.

The question presented is whether the Tax Court's determination that those amounts distributed by taxpayer to its stockholder physicians in excess of their billings for services rendered were nondeductible distributions of corporate income, rather than compensation for personal services within the meaning of § 23(a) of the Int.Rev.Code of 1939.[1] The corporation took the latter position and accordingly filed returns on this basis during the years in question. The Commissioner rejected this and determined deficiencies.

---

1. Int.Rev.Code of 1939, as amended by Sec. 121(a), Revenue Act of 1942, c. 619, 56 Stat. 798:

"§ 23. Deductions from gross income. "In computing net income there shall be allowed as deductions:

"(a) *Expenses.*

(1) *Trade or business expenses.*

"(A) *In General.* All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered * * *." 26 U.S.C. § 23(a).

## I—Facts

The case was submitted on a stipulation of facts supported by exhibits and some oral testimony. The facts must be understood. As found by the Tax Court, they may be summarized briefly as follows:

Petitioner is an Oregon corporation, organized in 1939, largely engaged in the business of selling prepaid medical, surgical and hospital plans or contracts in Klamath County, Oregon, and providing the medical and surgical services and hospitalization required under the plans and contracts. A primary source of petitioner's income is the premiums paid on the plans and contracts sold. Some other income is also received by petitioner from noncontract patients using the hospital facilities owned by petitioner. Stock ownership is limited to members of the Klamath County Medical Association. To provide this service which it contracts to supply, petitioner entered into contracts with all members of the County Medical Association, whereby they agreed to perform the services necessary. Under these contracts the doctors agreed to a schedule of base fees for each service which they performed and were to be paid according to a complex formula. The formula provides that when a doctor bills the Medical Service Bureau for a service he has rendered a patient, within thirty days the Bureau is to pay him fifty per cent of the base fee. Then every six months the petitioner is to pay him (less the fifty per cent already paid) *a percentage of the base fees* billed by the doctor, determined by the ratio which the total net income of petitioner (less certain amounts determined by the board to be necessary for corporate purposes) bears to the total fees billed by all the physicians during that six month period. In short, the petitioner determines what its net profit will be, deducts amounts necessary for retiring bonds, etc., and then pays out a percentage of its profits to the doctors, regardless of what the fee schedule amount would be, since the latter is only a *base* fee. During the years in question these payments amounted to 116.9, 115.7, and 134.3 per cent of each physicians' billings for the three years, so that in each year the excess over 100 per cent represented payments in excess of the fee schedule.

The Tax Court specifically found that while the fee schedule was unreasonably low when compared to like services and procedures and compensation charged therefor by physicians in private practice, it was equitable and fair when the lessened costs to doctors rendering services under the plan (which lessened costs are attributable to taxpayer's operation) were considered. None of the fees set were unreasonable in amount, and it was held that 100 per cent of the billings of physicians constituted reasonable compensation for the services for which taxpayer was billed.

From 1940 to 1943 petitioner operated solely as a service bureau and its income was solely from premiums on the contracts for medical care. However, in 1943 taxpayer bought the Hillside Hospital and in 1946 bought the Klamath Valley Hospital, and the Valley Hotel. Since that time, part of its income has come from the operation of these facilities.

Under its subscriber contracts services are furnished, except in emergency situations, by taxpayer's physician-stockholder-members and hospital services by the petitioner's hospitals. Subscribers away from Klamath in emergency cases may seek local care and petitioner will bear the cost of the services up to the limit of the fee schedule. Two individual contracts with subscribers exist under which the physician members agree "to accept K.M.S.B. Fees *as full payment* for Services for all eligible persons" whose family net income is less than $5,000 per year, and when the income exceeds this amount, then as to the amount charged by a physician, "Benefit payments made to the member by K.M.S.B. will act as a credit to total charges. Benefits Are the Same for All Persons Regardless of Income." There was testimony to the effect

that use was not made of the clause pertaining to those earning over $5,000.

Finally, all members of the petitioner obligated themselves to resell their stock in petitioner if they left the area or retired. They agreed that no member could sell his share without the written consent of taxpayer's board of directors, and within thirty days after notice to taxpayer of intention to sell, the taxpayer agreed to purchase all such stock at book value. In determining book value, the unpaid medical service charges on the part of taxpayer's member-physicians were to be valued at 100 per cent of the billings of such physicians.

The taxpayer's fee schedule was altered and amended, generally upward, from time to time to bring it more nearly level with charges by physicians in private practice. The schedule was used for the purpose of differentiating between medical and surgical procedures and to ensure that member physicians would receive like compensation for like services.

The Commissioner and the Tax Court disallowed as deductions by petitioner, for compensation to member doctors, all sums paid in excess of 100 per cent of the base fee schedule fees billed and approved for each doctor.

## II—The Law

The sole issue is: May petitioner deduct as "compensation," payments to its stockholder-member-physicians in excess of 100 per cent of base fee billings by its members?

Petitioner specifies as the primary error the finding and conclusion of the Tax Court that the excess over the 100 per cent of base fee billings was distribution of profits rather than compensation for services. Further error is urged in the subsidiary findings and conclusions that underlie the alleged primary error, to wit: that the contracts with the doctors were ambiguous when interpreted as obligating the doctors to perform their services for no more than the base fee schedule amounts; that this was part of a method of paying out earnings rather than compensating the doctors for their services; and that the fact that in some earlier years the doctors may have received *less* than 100 per cent of the base fees may not be taken into consideration here.

Petitioner's argument is based on three factors drawn from reading and interpreting Reg. 118, § 39.23(a)–6, promulgated under the Int.Rev.Code of 1939.[2] Petitioner claims that in this

---

**2.** "Sec. 39.23(a)–6. *Compensation for personal services.* (a) There may be included among the ordinary and necessary expenses paid or incurred in carrying on any trade or business a reasonable allowance for salaries or other compensation for personal services actually rendered. The test of deductibility in the case of compensation payments is whether they are reasonable and are in fact payments purely for services.

"(b) The test set forth in paragraph (a) of this section and its practical application may be further stated and illustrated as follows:

"(1) Any amount paid in the form of compensation, but not in fact as the purchase price of services, is not deductible. An ostensible salary paid by a corporation may be a distribution of a dividend on stock. This is likely to occur in the case of a corporation having few shareholders, practically all of whom draw salaries. If in such a case the salaries are in excess of those ordinarily paid for similar services, and the excessive pay-

ments correspond or bear a close relationship to the stockholdings of the officers or employees, it would seem likely that the salaries are not paid wholly for services rendered, but that the excessive payments are a distribution of earnings upon the stock. An ostensible salary may be in part payment for property. This may occur, for example, where a partnership sells out to a corporation, the former partners agreeing to continue in the service of the corporation. In such a case it may be found that the salaries of the former partners are not merely for services, but in part constitute payment for the transfer of their business.

"(2) The form or method of fixing compensation is not decisive as to deductibility. While any form of contingent compensation invites scrutiny as a possible distribution of earnings of the enterprise, it does not follow that payments on a contingent basis are to be treated fundamentally on any basis different from that applying to compensa-

area all cases based on the said regulation have established three tests: (1) Do the payments made bear any relation to the stockholdings? (Here, the answer is no, since all doctors have one share each, but are paid amounts differing by reason of the services performed); (2) Are the payments made in proportion to services rendered? (Here, that fact is undenied.); and (3) Are the payments reasonable in amount? (The Court held that they were reasonable up to 100 per cent, and indicated that it felt they would also be reasonable up to the amounts actually paid.) Thus, says petitioner, since there is no case to be found where all of these things were answered properly and the amounts denied as deductions for compensation, the Tax Court must be wrong. Furthermore, the amounts were always intended and characterized as compensation for services. Petitioner cites many cases to the effect that if one element or another be missing, the courts will disallow the deduction; and many cases showing that where the compensation was reasonable it is allowable as such, even though this may mean that the corporation has no profits. Compare,

however, e. g., Am-Plus Storage Battery Co. v. C. I. R., 7 Cir., 1929, 35 F.2d 167, 168–69. Furthermore, petitioner argues that the findings and conclusions of the Tax Court on the subsidiary holdings are not justified by the evidence, primarily because petitioner seems to think the court places too much emphasis on the fact that the compensation of the doctors was based on a percentage of the net profits and that the doctors had agreed to the base fee schedule. As petitioner points out, in a proper case, there is nothing wrong with a corporation paying compensation on a percentage of profits if it is reasonable and paid in accordance with services rendered. See William S. Gray & Co. v. United States, 1929, 35 F.2d 968, 68 Ct.Cl. 480, where such an arrangement was allowed, citing other cases to the same effect.

The government admits much of what petitioner claims is the law, but points out that its (petitioner's) brief overlooks a basic point of the Tax Court decision— that the Tax Court found initially that payment of the amounts over 100 per cent were not compensation, but rather a guise for distributing corporate profits.[3]

tion at a flat rate. Generally speaking, if contingent compensation is paid pursuant to a free bargain between the employer and the individual made before the services are rendered, not influenced by any consideration on the part of the employer other than that of securing on fair and advantageous terms the services of the individual, it should be allowed as a deduction even though in the actual working out of the contract it may prove to be greater than the amount which would ordinarily be paid.

"(3) In any event the allowance for the compensation paid may not exceed what is reasonable, under all the circumstances. It is in general just to assume that reasonable and true compensation is only such amount as would ordinarily be paid for like services by like enterprises under like circumstances. The circumstances to be taken into consideration are those existing at the date when the contract for services was made, not those existing at the date when the contract is questioned."

3. "We think it must be concluded from this record that, with respect to that portion of the payments here involved which exceed 100 per cent of the billings of petitioner's staff doctors, such payments were distributions of petitioner's profits and earnings. We are led to this conclusion because of the contract under which petitioner was bound to pay its member doctors for their services rendered. That instrument is ambiguous with respect to the compensation for such services. It does not specifically provide for the payment of over 100 per cent of the billings for such services but does provide specifically that the billings be in accordance with its fee schedule. It also provides specifically that staff physicians will furnish professional service to petitioner's subscribers in accordance with the terms and limitations of the contract between petitioner and such subscribers. It is also noted therein that the individual member physician has read such contracts. We assume therefrom he was fully aware of the terms thereof when executing his employment contract with petitioner. Two of the contracts by which petitioner sells its services to subscribers provide on their faces that petitioner's member physicians accept

The government would have us note these other factors: (1) If this arrangement is condoned, the taxpayer may well be able to pay out year after year all its profits in the form of compensation, and never pay taxes; (2) the petitioner's argument conveniently overlooks the fact that some of the income of the corporation passed along to the doctors as compensation for their services comes from the operation of the hospitals, and not from their services; (3) that the rate schedule was raised several times in several years, indicating an intention of the doctors to have this varying schedule of fees represent the amount of compensation they were to get; (4) the amount received by the doctors, if limited to the base fee schedule amount, still constitutes a reasonable compensation, since there are certain savings to the doctors under this arrangement, not to mention the convenience of owning their own hospitals; and finally, (5) the petitioner conveniently overlooks the fact that the burden of proving that this amount over 100 per cent is *in fact* compensation and not a distribution of profits, is on the petitioner; and the trier of fact simply did not think this burden was satisfied. The government argues that since the Tax Court found initially that this pay-

petitioner's fees as payment in full for services to persons or employees or their families whose net income is less than $5,000 per year. It is provided further that, when the family income is in excess of $5,000 per year, the subscriber must make his own arrangements with the physician regarding fees in which event 'Benefit payments made to the member by K.M.S.B. (petitioner) will act as a credit to total charges.' It seems clear from this that petitioner has contracted with its member physicians that they will render their services to petitioner for fees equal to its fee schedule regardless of the fact that such fees may be in some instances below reasonable compensation therefor. This is not unrealistic when it is considered that staff doctors do not bear certain office administrative expense in their rendition of services to petitioner's subscribers which would be borne by them with respect to private patients. One hundred per cent of the billings of staff doctors for services rendered constitute the total

ment over 100 per cent was not compensation, the element of reasonableness never enters into the picture after that point. Twin City Tile & M. Co. v. C. I. R., 8 Cir., 1929, 32 F.2d 229. The question of the character of the sums paid is basically a question of fact, which the Tax Court found against the petitioner.

■ The Commissioner was the prevailing party below, and hence we must take that view of the evidence most favorable to him. He is entitled to the benefit of all favorable inferences from the facts proved. If, when so viewed, there was substantial evidence to sustain the findings of the Tax Court, then the judgment may not be reversed by this Court unless the clear weight of the evidence is against it, or the trial court was influenced by an erroneous view of the law. Stacher v. United States, 9 Cir., 1958, 258 F.2d 112, 116; John Hancock Life Ins. Co. v. Cohen, 9 Cir., 1958, 254 F.2d 417; Vidales v. Brownell, 9 Cir., 1954, 217 F.2d 136.

There is another reason why we believe the judgment of the Tax Court was correct. As the Tax Court interpreted a contract it found to be ambiguous, the petitioner's members had signed contracts with it whereby the petitioner was

expense for such services for which petitioner is liable under its employment contract. There is no express contract requirement that they be paid in excess of 100 per cent of billings for their service.

"That petitioner intended to distribute earnings under the guise of payment for services rendered seems clear to us in the light of the testimony of the president of petitioner's board of directors during the years at issue.

\* \* \* \* \*

"It seems clear from this testimony that under its contract with member physicians petitioner intended that all of its earnings in excess of amounts necessary for its operation, planned expansion and reserves were to be distributed to its member-stockholder physicians. Viewed in that light the contract provides not only a method of computation for services rendered but also a method for distribution of its profits to its stockholders."

obligated to pay them 100 per cent of the base fee (however and at whatever figure it was set), *but no more!* Any amount over and beyond the 100 per cent base fee could, or could not, be paid to the doctor-members, as the management saw fit. The petitioner could use it for the buying of office equipment or equipment for the hospital, or new hospitals, or even a hotel. This voluntary payment to the doctors of more than the 100 per cent of base pay the doctors had agreed to accept as compensation in full for their services, might be an ordinary, but could not be a necessary, expense and hence, not an *ordinary* and *necessary* expense. But that is the only expense dealt with in § 23(a) of Int.Rev.Code of 1939; and the only deduction allowable thereunder.

We cannot conclude the Tax Court was clearly erroneous in its decision, and its decision is therefore affirmed.